LOUISE C. WATKINS, GUARDIAN FOR JERRY MITCHELL WATKINS, INCOMPETENT V. CLYDE MURROW, D/B/A TRANSFER AND RENTAL COMPANY, TEXTILE INSURANCE COMPANY AND BYRD MOTOR LINES, INC. AND IOWA MUTUAL INSURANCE COMPANY.

(Filed 20 January, 1961.)

1. **Master and Servant § 3—**
    A contractual declaration that one of the contracting parties should have exclusive direction and control in the performance of the work is not conclusive as to whether such party is an independent contractor, but it is also necessary that the evidence disclose that the work was in fact performed pursuant to that contract.

2. **Same:    Master and Servant §§ 48, 51—**
    Where the evidence discloses that the lessor of vehicles for trips in interstate commerce under lessee's franchise employed and paid the drivers of such vehicles and did in fact exercise direction and control over the drivers on such trips, the lessor is the employer of such drivers, notwithstanding provision in the trip-lease agreement that the drivers should be under the exclusive direction and control of lessee, and lessor is liable for compensation to one of such drivers for injuries received in an accident arising out of and in the course of his employment.

3. **Same—**
    The lessee of vehicles, with drivers furnished by lessor, for trips in interstate commerce under lessee's franchise will be held liable as a matter of public policy for compensation for injury to such drivers by accident arising out of and in the course of their employment.

4. **Same—**
    While the lessee of a vehicle for a trip in interstate commerce may, as a matter of public policy, be held liable by a driver for injuries received by accident arising out of and in the course of the employment, as between lessor and lessee the contractual provisions between them as to liability may be enforced when the rights of the employee are not

adversely affected, and under provisions of the contract obligating lessor to indemnify lessee against any loss resulting from injury or death of such driver, the Industrial Commission may hold lessor and its insurance carrier primarily liable.

### 5. Master and Servant §§ 53, 66—

Where a driver is responsible for the care and safekeeping of the vehicle while being driven on a trip, and customarily sleeps in the cab while on a trip, injury to the driver from carbon monoxide poisoning while he was sitting in the cab at his destination awaiting the opening of the business of the consignee, is an injury by accident, and such poisoning is not an occupational disease.

APPEALS by plaintiff and defendants Clyde Murrow, d/b/a Transfer and Rental Company, and Textile Insurance Company from *Preyer, J.,* December 14, 1959 Special Term, of GUILFORD.

These appeals are from a judgment affirming in part and reversing in part findings of fact and conclusions of law and an award based thereon made by the Industrial Commission which directed payment of compensation to Jerry Mitchell Watkins for injuries sustained in the course of his employment.

Jerry Mitchell Watkins, hereafter designated as claimant, was, on 9 March 1957, the driver of a tractor-trailer owned by Clyde Murrow, d/b/a Transfer and Rental Company, hereafter designated as Murrow. This vehicle and other vehicles, with operators, were leased by Murrow to Byrd Motor Lines, Inc., hereafter designated as Byrd, for use in its franchise business of hauling furniture from High Point and other points in North Carolina in interstate commerce. Murrow and Byrd were subject to the provisions of the North Carolina Workmen's Compensation Act. Textile Insurance Company, hereafter designated at Textile, was the statutory insurance carrier for Murrow. Iowa Mutual Insurance Company, hereafter designated as Iowa, was the statutory insurance carrier for Byrd.

The Commission, finding claimant, an employee of Murrow and of Byrd, had sustained an injury, awarded compensation to be paid by their insurance carriers. Defendants, having excepted to the findings and conclusions made by the Commission, appealed to the Superior Court. Judge Preyer affirmed the findings and conclusions in part but sustained Byrd's exception to the finding that claimant was a joint employee of Byrd and Murrow. He concluded that claimant was an employee of Murrow, and liability for compensation awarded was primarily the obligation of Murrow and his insurance carrier. He remanded the cause to the Commission to amend its award to conform with his conclusions. Claimant and defendants Murrow

and Textile excepted to the court's rulings and appealed. Additional facts determinative of the appeal appear in the opinion.

*Walser & Brinkley for plaintiff.*
*Smith, Moore, Smith, Schell & Hunter for defendant appellants.*
*Jordan, Wright, Henson & Nichols for defendant appellees.*

RODMAN, J. We have read with care the testimony and the exhibits. We find no factual conflict in the evidence. The facts found by the Commission are amply supported by the evidence. The parties disagree as to the conclusion drawn from and the legal effect of the undisputed evidence. The facts found by the Commission may be summarized as follows: Byrd was a duly franchised interstate motor carrier of furniture from designated points in North Carolina. Murrow had no right or authority to transport freight in interstate commerce in his own name. Claimant was hired by Murrow in December 1956 as a truck driver to drive Murrow's trucks in the transportation of goods in interstate commerce as permitted by Byrd's franchise. Prior to 1 January 1957 Murrow hauled for Byrd in interstate commerce. On that date a written agreement was executed in which Byrd "(a) Agrees that during the term of this lease, the said vehicle(s) shall be solely and exclusively under the direction and control of the Lessee who shall assume full common carrier responsibility (1) for loss or damage to cargo transported in such motor vehicle and (2) for the operation of such vehicle." In addition to the foregoing provision quoted by the Commission, the agreement designated Murrow as lessor provides: "LESSOR HEREBY . . . (b) Agrees that during the term of this agreement, the Lessor shall fully maintain, service and keep the vehicle(s) above described in good repair, provide all gas, oil, tires and other equipment necessary and pay driver'(s) salary . . . (e) Agrees to indemnify Lessee against (1) any loss resulting from the injury or death of such driver(s) and (2) any loss or damage resulting from the negligence, incompetence or dishonesty of such driver(s) . . ." Textile insured Murrow's liability under the Workmen's Compensation Act from 14 May 1956 to 14 May 1957. Before Textile issued its policy to Murrow, Murrow's employees, including claimant and other drivers hired by Murrow, were protected by compensation insurance carried by Byrd with Iowa. Prior to 14 May 1956, Murrow reimbursed Byrd for the premiums paid for insurance on the drivers hired by Murrow. Subsequent to that date, Murrow, by agreement with Byrd, paid these premiums directly to the insurance carrier selected by him.

When Textile issued its compensation policy to Murrow, it collected premiums based on the wages paid Murrow's drivers, including the wages paid to claimant for hauling under Byrd's franchise.

Textile furnished Byrd a certificate that Murrow was insured by it under the Workmen's Compensation Act. This was required by Byrd in his negotiations with Murrow and was an effort to protect Byrd from liability for injuries to drivers of Murrow's trucks. Prior to the time Textile issued its policy to Murrow and during the life of the policy, Textile was aware that Murrow was operating at least in part under the Interstate Commerce Commission rights of Byrd.

Murrow's terminal in High Point was the point of origin and return on all trips which claimant made in interstate commerce. Upon returning from a trip, claimant would account to Murrow for freight collected by claimant in the form of cash and checks. Murrow made an accounting to Byrd at the end of each week. Murrow' solicited business in Byrd's name. The goods to be transported by Murrow for Byrd would be collected at Murrow's terminal, then loaded in the truck. Murrow's office typed and prepared statements, planned the trip, designated the route, consignees, and the several destinations. Byrd never gave instructions to the drivers of Murrow's trucks and never hired or discharged any of Murrow's drivers. He did not know their names or identities. Murrow made social security and income tax deductions from claimant's pay.

On 7 March 1957 claimant and his brother, driving a tractor-trailer owned by Murrow, left Murrow's terminal in High Point. They were hauling a load of furniture under and pursuant to the contract agreement entered into by Byrd and Murrow effective 1 January 1957. The vehicle carried a sign showing Byrd's interstate certificate number. After making deliveries of furniture in Ocala and Gainesville, Florida, claimant and his brother proceeded towards Jacksonville. Before arrival there, the exhaust pipe on the vehicle came loose from the engine manifold. They undertook to make repairs but were unable to make a tight connection because the exhaust pipe and gasket were burned. They arrived at Ferguson's Furniture Company, about seven miles from Jacksonville, the afternoon of 8 March after the store had closed. They parked the trailer on Ferguson's lot, adjacent to his loading platform. After supper they drove to Jacksonville where they worked about two hours attempting to repair the exhaust. They were not able to make a tight connection. After driving around Jacksonville to locate other stores at which they expected to make deliveries the following day, they returned to Ferguson's lot about midnight and parked the tractor beside the

trailer. Claimant's brother got into the trailer, used quilts to keep warm, and immediately went to sleep. Claimant got into the cab of the tractor and ran the motor to heat the cab. The windows and doors were closed except for a small opening in the right window. There were openings in the floor board of the cab around the clutch, brake, and accelerator sufficient to permit the entry of carbon monoxide in gaseous form, which is slightly lighter than air. About 1:00 a.m. on 9 March claimant was observed in the cab, at which time the motor was running and white fumes coming from the motor could be seen under the tractor. About 8:00 a.m. on 9 March, claimant's brother was awakened by an employee of Ferguson. He observed claimant sitting slumped over the steering wheel. He called but was unable to arouse claimant. When he succeeded in opening the door, he found claimant unconscious. The motor of the tractor was not running. The ignition switch was in the on position, and the heater fan was running. Continued efforts to awaken and revive claimant failed. About noon he was taken to St. Vincent's Hospital, unconscious and in shock. There was no evidence of traumatic injury. A diagnosis of carbon monoxide poisoning was made two or three days after 9 March. Claimant remained in St. Vincent's Hospital until 30 May 1957. He was then taken to North Carolina Baptist Hospital in Winston-Salem where he remained until 1 May 1958, when he was transferred to Maple Grove Rest Home at Walkertown, where he is still a patient. Some slight improvement was noted while in the hospital. He regained some ability to speak, but not in an intelligent manner. His condition has remained substantially the same since removal to the rest home. Claimant had sustained an injury to the brain resulting in loss of mental capacity and paralysis. The disability is total and permanent.

Claimant and other drivers of Murrow's trucks customarily slept in the cab of the tractor or in the trailer at night. This fact was known by Murrow and could have been ascertained by Byrd upon inquiry. Claimant's sleeping in Murrow's tractor on 8 and 9 March 1957 served to protect the tractor, the trailer, the contents of the trailer, and would have enabled claimant to be available to unload the trailer immediately upon Ferguson's being opened on 9 March. Claimant was responsible for the care and safekeeping of the vehicle and its contents at all times when away from High Point.

In addition to the facts found as summarized above, the Commission found: "At all times between December 10, 1956, to and including March 9, 1957, when operating one of Murrow's trucks, claimant was an employee of Murrow and Byrd." "On March 9,

1957, claimant received an injury by accident arising out of and in the course of his employment with the defendant employers Murrow and Byrd when he breathed carbon monoxide gas."

Murrow and Textile assign as error the factual conclusion made by the Commission and affirmed by Judge Preyer that claimant was an employee of Murrow. They contend the provision in the lease which gave Byrd the exclusive direction and control of the vehicle operated by claimant made Byrd the sole employer, relieving Murrow of liability for claimant's injury.

The answer to this contention is twofold: First, the liability or nonliability of Byrd to claimant does not necessarily determine Murrow's relationship to claimant and the resulting liability or nonliability for the injuries sustained. As said by *Bobbitt, J.:* "The hybrid nature of these trip-lease agreements has caused much litigation. In reality, contrary to the Biblical admonition, a driver, employed and furnished by the lessor, must serve two masters." *Employment Security Comm. v. Freight Lines,* 248 N.C. 496, 103 S.E. 2d 829. Second, a mere contractual declaration is not determinative of the relationship and the rights of the parties. A contract declaring one an independent contractor free from control and direction by the owner does not in fact establish that relationship. There must be further evidence to show that the work was in fact performed pursuant to that contract. If not so performed, a contractual provision vesting or forbidding the owner to exercise control is immaterial. *Young v. Lumber Co.,* 147 N.C. 26; *Leonard v. Transfer Co.,* 218 N.C. 667, 12 S.E. 2d 729.

A contention similar to that advanced by Murrow and Textile was made in *War Emergency Co-op. Ass'n. v. Widenhouse,* 169 F 2d 403. *Judge Parker,* in disposing of the contention, said: "It is argued that the driver of the truck should be held the employee of defendant and not of Widenhouse because the rules of the Interstate Commerce Commission require that leased vehicles be operated by employees of the licensed operator, because the written contract between Widenhouse and defendant provides that defendant shall direct, control and manage the use of the truck and because liability insurance was carried by the defendant. None of these things, however, nor all of them taken together, furnish any reason for ignoring the true relationship existing between the parties . . . As for the contract provision, it was not observed, and manifestly cannot affect the question of liability, which is to be determined by the real relationship of the parties."

The findings made by the Commission, based on and supported by the testimony of Murrow himself, clearly established that, notwithstanding the contract provision, Murrow exercised control of the drivers he placed on his vehicle operated under Byrd's franchise, that Byrd did not exercise and was not in fact expected to exercise control over them.

On the findings, supported as they are by the evidence, Judge Preyer correctly held that claimant was an employee of Murrow.

The Commission concluded that claimant was an employee of both Murrow and Byrd, thereby placing joint liability on Murrow and Byrd for claimant's injuries. Byrd's exceptions and assignments of error to this finding and conclusion were sustained by Judge Preyer. Murrow and Textile assign that ruling as error. This assignment requires an examination of the evidence on which the Commission based its factual conclusion.

The only evidence tending to establish the relationship of employer and employee between Byrd and claimant is the agreement by which Murrow leased his trucks and furnished drivers to Byrd, thereby vesting Byrd with complete direction and control of the vehicle.

Most of the cases involving the liability of a franchise carrier arise out of injuries to a third person in no way related to or connected with the operation of the business of the franchise carrier. In cases of that character it is uniformly held that the franchise carrier cannot escape liability even though he in fact exercises no control over the driver. *Wood v. Miller,* 226 N.C. 567, 39 S.E. 2d 608; *Motor Lines v. Johnson,* 231 N.C. 367, 57 S.E. 2d 388; *Hill v. Freight Carriers Corp.,* 235 N.C. 705, 71 S.E. 2d 133.

We have not only held the franchise carrier liable for injuries sustained by third persons but have held it liable for compensation as provided in our Workmen's Compensation Act to drivers transporting goods under its franchise.

This was first decided in *Brown v. Truck Lines,* 227 N.C. 299, 42 S.E. 2d 71. A careful reading of that case will show that imposition of liability was based on public policy. The public policy which led to the enactment of the Workmen's Compensation Act likewise required drivers to be classified with the public and entitled to protection from injuries resulting from the interstate operation. The Court expressly declared the franchise carrier could not evade the provision of G.S. 97-6, and, in concluding its opinion, said: "The defendant corporation having been given a franchise for the operation of motor trucks on the highway as a carrier of goods in interstate commerce, cannot evade its responsibility by delegating its authority

to others. (Citation.) Nor may an employer, by leasing the truck of one not authorized to transport goods in interstate commerce and causing its operation under its own franchise and license plates for interstate transportation avoid legal responsibility therefor."

The conclusion there reached was merely an enlargement of the class entitled to protection when injured by an unlicensed assignee of a franchise carrier. *Hough-Wylie Co. v. Lucas*, 236 N.C. 90, 72 S.E. 2d 11; *Bryant v. Lumber Co.*, 174 N.C. 360, 93 S.E. 926; *Logan v. R.R.*, 116 N.C. 940; *Aycock v. R.R.*, 89 N.C. 321.

The result reached in *Brown v. Truck Lines, supra,* was reaffirmed in *Roth v. McCord*, 232 N.C. 678, 62 S.E. 2d 64. The Court limited its holding to the right of the driver to recover from a franchise carrier.

In discussing the relationship and the respective rights and obligations between lessor, lessee, and driver, *Barnhill, J.,* (later *C.J.*) said in *Hill v. Freight Carriers, supra:* "Hence, as between the plaintiff and the defendant, purely in respect to their mutual contractual rights and liabilities, one to the other, the owner of the vehicle occupied the position of independent contractor. (Citations.)

"On the other hand, the vehicle was to be operated in interstate commerce in furtherance of the business of the lessee as a franchise carrier of freight. It was to be operated under the franchise and license plates of the lessee in fulfillment of its contracts for transportation of freight in interstate commerce. Therefore, the person who actually operated the vehicle (whether the owner or a third party hired by him) was, as between the franchise carrier and the consignor, the consignee, and third parties generally, a servant or employee of the defendant. This is true in fact for he transported cargoes in behalf of the franchise carrier and dealt with the consignors, consignees, and the public generally as agent of the franchise carrier. Furthermore, public policy requires it to be so held.

"As plaintiff elected to operate his own tractor, he was, as operator, a servant of defendant. (Citations).

"That is to say, the relation of independent contractor was created by the contract. The master-servant relation arose when plaintiff— in lieu of employing someone else—undertook to operate the tractor-trailer for defendant in fulfillment of his contract. One is entirely dependent upon, and the other is entirely independent of, the contract."

*Brown v. Truck Lines, supra,* and *Roth v. McCord, supra,* were cited and made the basis for holding a driver entitled to compensation

payments for injuries sustained when driving for the franchise carrier. *McGill v. Freight*, 245 N.C. 469, 96 S.E. 2d 438.

The conclusion reached in *Brown v. Truck Lines* was last declared the law of this State in *Suggs v. Truck Lines*, 253 N.C. 148, decided in October 1960. No sound reason has been advanced which would justify us in reversing the conclusion originally reached in *Brown v. Truck Lines, supra*, and consistently followed since that decision. It follows that Byrd and his carrier are liable to claimant.

Having reached the conclusion that Byrd and Murrow are each responsible to claimant, we must, because of the holding by the Commission that they are jointly liable, which conclusion was reversed by Judge Preyer, determine what are the relative rights and obligations of the parties.

The question now presented was not answered in *Roth v. McCord, supra*. It was put aside to be answered in another action. Nor was it determined in *McGill v. Freight, supra*. Bobbitt, J., there said: "No question is involved here as to the rights and liabilities of Bison and Matthews *inter se*, by reason of the terms of the lease agreement or otherwise. Compare: *Hill v. Freight Carriers Corp.*, 235 N.C. 705, 71 S.E. 2d 133; *Newsome v. Surratt, supra*.

"It appears here that Matthews had no compensation insurance coverage; and, unless decedent is so considered, Matthews had no employees. Hence, if Matthews were considered an independent contractor, as defendants contend, it would seem that Bison would be liable for the payment of compensation under the Act. G.S. 97-19."

The right of a franchise carrier to lease equipment to be operated by a driver furnished by the owner is permissible under regulations promulgated by the ICC. The contract between Byrd and Murrow was prepared to meet ICC requirements. It was put in evidence by Murrow and Textile. It expressly obligated Murrow to indemnify Byrd against "any loss resulting from the injury or death of such driver." This contractual obligation in no way conflicts with public policy. No sound reason has been advanced why it should not be enforced. Its enforcement will in no way prejudice claimant.

To assure compliance with the quoted provision, Murrow purchased insurance from Textile. The wages paid claimant and other drivers were one of the factors used to determine the premium Textile collected. Textile certified to Byrd that Murrow had procured workmen's compensation insurance.

The right of a franchise carrier to recover from his lessor in accordance with his contractual obligation was determined in *Newsome v. Surratt*, 237 N.C. 297, 74 S.E. 2d 732. The contract then under con-

sideration contained provisions identical with those in the contract between Murrow and Byrd. *Denny, J.,* said: "We have held that when an interstate franchise carrier executes a lease or contract by which its equipment is augmented and used as one of its fleet of trucks under its franchise and with its license plates attached thereto, the holder of the franchise is responsible for the operation of the truck in so far as third parties are concerned. (Citations). We have likewise held that the franchise carrier in such cases is also liable to the driver of such truck for any injury that may arise out of and in the course of his employment within the purview of our Workmen's Compensation Act, and that the driver of such leased vehicle is not bound by any provision in the lease to the contrary. (Citations)

"The liability thus imposed on interstate franchise carriers is to prevent such carriers from evading their responsibility by the employment of irresponsible persons as independent carriers. *Hodges v. Johnson, supra* (52 F Supp 488); *War Emergency Co-op. Ass'n. v. Widenhouse, supra.* However, as pointed out by *Parker, J.,* in the last cited case, the liability of the franchise carrier was secondary, and in the absence of some countervailing equity, the carrier is entitled to recover over against the owner of the leased truck."

We hold the contract between Murrow and Byrd made Murrow and Textile as his insurance carrier primarily liable to claimant.

The final question presented by the assignments is: Did plaintiff suffer an accident arising out of and in the course of his employment, or is he the victim of an occupational disease? We think the finding by the Commission that claimant was injured by an accident is correct. *Cabe v. Parker-Graham-Sexton, Inc.,* 202 N.C. 176, 162 S.E. 223; *Beck v. C. & J. Commercial Driveaway,* 245 N.W. 806 As said in *Henry v. Leather Co.,* 234 N.C. 126, 66 S.E. 2d 693: "An injury by accident, as that term is ordinarily understood, 'is distinguished from an occupational disease in that the former rises from a definite event, the time and place of which can be fixed, while the latter develops gradually over a long period of time.' " The findings negative an occupational disease. They establish an accidental injury as found by the Commission.

Plaintiff's appeal was taken as a precaution, to secure compensation by Byrd and Iowa in the event Murrow and Textile were held not liable.

Judge Preyer was in error in holding that Murrow was the sole employer of claimant. Public policy makes him likewise a servant of the franchise carrier not to be denied the benefits of the Workmen's Compensation Act by contract between lessor and lessee. He

correctly concluded as between lessor and lessee the contract was binding, imposing primary liability on lessor. He properly remanded the cause to the Industrial Commission. The judgment is modified to conform wth this opinion.

Modified and Affirmed.