***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The carrier allegedly liable on the risk was correctly named above.
2. The employee's average weekly wage will be determined from an I.C. Form 22 Wage Chart to be provided by employer/carrier at the time of the hearing before the Deputy Commissioner.
3. The employee sustained an injury (or started missing time from work because of disease) on or about March 30, 2000, with the exact date to be determined by the Industrial Commission.
4. The parties stipulate into evidence as Stipulated Exhibit #1, the pre-trial agreement.
5. The parties stipulate into evidence as Stipulated Exhibit #2, a packet of exhibits, stipulated to by the parties and submitted subsequent to the hearing before the Deputy Commissioner, by letter dated February 5, 2002.
6. The parties stipulate into evidence as Stipulated Exhibit #3, additional stipulated items, stipulated to by the parties and submitted subsequent to the hearing before the Deputy Commissioner, by letter dated June 6, 2002.
7. The parties stipulate into evidence as Stipulated Exhibit #4, average weekly wage stipulation by parties by letter dated December 4, 2002, and submitted subsequent to the hearing before the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty year-old male who had completed the ninth grade in education. Prior to March 17, 1998, plaintiff had worked as a welder, had worked in construction and after obtaining his CDL license, worked in long-hauling trucking. Plaintiff had also transported manufactured homes for another employer under that employer's authority to operate, as granted by the Interstate Commerce Commission (ICC).
2. The plaintiff owned a truck of his own. The plaintiff had no authority or license by the ICC to transport in interstate commerce in his own name.
3. The defendant-employer is a corporation engaged in transportation, in interstate, intrastate and foreign commerce. In its capacity to transport, the defendant-employer has been authorized, qualified and registered by the proper state and federal agencies, including the ICC.
4. Prior to the start of employment, plaintiff and defendant-employer entered into an agreement in writing. Under the terms of this agreement, the plaintiff leased his truck to the defendant-employer, and the defendant-employer was to furnish and supply this leased truck with, among other things, the defendant-employer's ICC license number that would permit this truck to transport in interstate commerce. Plaintiff was required to attach to the leased truck the defendant-employer's ICC license number, among other defendant-employer's state and federal license numbers. This was required in order to properly identify this truck as operating under the defendant-employer's authority granted by these agencies.
5. Under the terms of their lease-agreement, the defendant-employer had the exclusive possession, control and use of the leased truck, and assumed complete responsibility to its operation during the period of their lease-agreement. Accordingly, when plaintiff leased his truck to the defendant-employer the control of said leased truck for purpose of its operation and transportation in commerce passed out the control of plaintiff, and that the control of such truck was solely and exclusively in the possession of the defendant-employer.
6. Mike Scialpi, the director of Safety and Compliance for defendant-employer, testified by deposition. Mr. Scialpi confirmed that federal regulations require the defendant-employer, as holder of the authority and license to transport granted to it by the ICC, maintain the exclusive control of the plaintiff's leased truck. Mr. Scialpi stated that plaintiff did not have the right to drive for other companies or to use his leased truck for any other reasons, while it was identified as operating under defendant-employer's ICC license number. Mr. Scialpi agreed that plaintiff was operating his leased truck under defendant-employer's ICC number and certificate.
7. As part of the relationship, which was established between plaintiff and defendant-employer by their lease — agreement, plaintiff was provided by defendant-employer with its Driver Orientation Manual (D.O.M.). This D.O.M. contained numerous guidelines and procedures required of drivers for defendant-employer. One of the sections is entitled "Driver's Daily Logs", and instructs how drivers are to complete their driver's record of duty status better known as the driver's daily logs, or just logs. The completion of the driver's record of duty status was required by all drivers with defendant-employer, and defendant-employer's stated policy was "No logs-No final pay".
8. The "Driver's Daily Logs" section specifically defines when a driver is "On duty" and "Driving".
9. The "On-Duty" section is defined as follows: on duty time is ALL time from the time you begin to work or are required to be in readiness to work until the time you are relieved from work and all responsibility for performing work. Included in the On-duty status, but not limited to, were the following:
— time inspecting equipment
— all driving time as defined in Number three
 — all time, other than driving time, spent in a commercial motor vehicle except sleeper berth rest time
 — all time spent with a disabled vehicle, either repairing, waiting or obtaining assistance
— performing any other work for the carrier, in any capacity.
10. The "Driving" section (Number 3) is defined as follows:
 "Driving time is defined as ALL time you spend at the driving controls of a commercial motor vehicle in operation. This means if you happen to be stalled in a traffic jam in Chicago at rush hour and cannot move for thirty minutes, but you are at the controls, this is driving time!"
11. Another section in defendant-employer's D.O.M. is entitled "Vehicle Inspections". This section requires that drivers conduct pre-trip and post-trip inspections on their trucks leased by defendant-employer. The drivers were instructed to note the completion of these inspections on the backside of their required daily-logs.
12. On or about March 29, 2001, either plaintiff had called-in or defendant-employer had called plaintiff, and plaintiff was given an assignment for a trip on March 30, 2000. plaintiff accepted this trip assignment for march 30, 2000. At this time and on March 30, 2000, plaintiff was still operating under the terms of his lease-agreement with defendant-employer.
13. On the morning of march 30, 2000, in preparation for his trip for defendant-employer, plaintiff began his daily log and completed his pre-trip inspection while at his residence. After leaving his residence, and in preparation for his trip, plaintiff stopped and had his leased truck fueled-up. After fueling-up, plaintiff proceeded on his usual and customary route to the mailbox located at the guard-shack to pick-up his necessary paper work for his trip-assignment by defendant-employer. While en route to the mailbox, and while plaintiff was at the controls and operating his leased truck, it caught on fire. Plaintiff was injured while trying to exit his disabled leased truck.
14. On March 30, 2000, when plaintiff was trying to exit his disabled leased truck his left foot was caught in the seat belt strap, and he fell down to the ground. As plaintiff was falling his head hit on the side of the truck, and he was hanging by his left foot. Plaintiff had to be freed from hanging upside down by the assistance provided to him by his escort passenger. At the scene, plaintiff felt a burning down his left leg, his arm and left leg down to his foot went numb, and he felt a sharp-pain in his back. The Highway Patrol arrived to provide assistance, and plaintiff was taken to the hospital for examination. Plaintiff's leased truck completely burned at the scene.
15. The facts found concerning plaintiff's activities in preparation for his trip assignment, his operation of his leased truck when it caught fire, and that he was injured trying to exit his disabled leased-truck are not controverted.
16. Under these facts plaintiff was clearly in control and operating his leased truck in furtherance of defendant-employer's trip-assignment. As such, plaintiff was operating within the exclusive control and under the complete responsibility of defendant-employer.
17. Following his March 30, 2000 accident, plaintiff was treated by Dr. David Howell, his family physician. Plaintiff continues to be treated by and remains under the care of Dr. Howell. During the course of treatment of plaintiff, Dr. Howell has referred plaintiff to a number of specialists, including orthopedists, neurologists, and pain specialists.
18. Dr. Howell testified that following plaintiff's March 30, 2000 accident plaintiff's back and left hip problems were much more severe, and caused plaintiff more problems with activities of daily life.
19. Dr. Howell has restricted plaintiff's activities following his March 30, 2000 accident, and these same restrictions have remained throughout the course of his treatment of plaintiff, including his last visit with Dr. Howell on march 27, 2002. These restrictions are that plaintiff not drive due to the strong pain medications plaintiff is taking. Plaintiff takes oxycontin and Lorcet Plus for pain. Plaintiff's restrictions also include no prolonged standing, bending or stooping or lifting, and due to his ulnar nerve injury he has problems with the use of his hands.
20. Dr. Howell opined plaintiff's prognosis was poor and he would not be employable with his current restrictions.
21. On March 30, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, resulting in injuries to his back, left leg, hip, and left ulnar nerve.
22. As a direct and proximate result of the injuries sustained by plaintiff on March 30, 2000, and his resulting medical conditions, plaintiff was unable to work earning the same or greater wages he earned before his injury, or any wages, in his former employment or any other employment since March 30, 2000.
23. Plaintiff's average weekly wage at the time of his March 30, 2000 injury by accident was $265.40, yielding compensation rate of $176.93 per week.
24. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement nor been evaluated for any permanent impairment.
25. plaintiff is entitled to have defendants provide all medical treatment necessitated by his March 30, 2000 compensable injury, including all treatment recommended by Dr. Howell.
26. Plaintiff may be capable given time, sufficient rehabilitative assistance and with specific work restrictions, to perform some level of employment approved by Dr. Howell.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The defendant-employer cannot evade its responsibility by delegating its authority to others. The operation of the truck was in law under the supervision and control of the interstate franchise carrier and could be lawfully operated only by those standing in the relationship of employee to the authorized carrier. Brown v. Truck Lines, 227 N.C. 299, 42 S.E.2d 71
(1947).
2. As stipulated in the lease contract, while they are in the service of the Motor Lines, the vehicle and its driver shall be under the exclusive supervision, control, and direction of the lessee. The all-inclusive extent of this right of control is spelled out in the lease in detail. As the Motor Lines has contracted, so is it bound. Roth v.McCord, 232 N.C. 678, 62 S.E.2d 64 (1950).
3. The lessor-driver, under a trip-lease agreement with an interstate commerce carrier, is deemed to be an employee of the carrier, for workman's compensation purposes, while operating the equipment under the carrier's ICC authority. Watkins v. Murrow, 253 N.C. 652, 118 S.E.2d 5
(1961); Suggs v. Truck Lines, 253 N.C. 652, 118 S.E.2d 267 (1957); Rothv. McCord, 232 N.C. 678, 62 S.E.2d 64 (1950); Brown v. Truck Lines,227 N.C. 299, 42 S.E.2d 71 (1947)." Smith v. Central Transport51 N.C. App. 316, (1981).
4. "Preliminary preparations by an employee, reasonably essential to the proper performance of some required task or service, is generally regarded as being within the scope of employment and any injury suffered while in the act of preparing to do a job is compensable." Thompson v.Transport Co., 32 N.C. App. 692 (1977).
5. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment and as a direct result of a specific traumatic incident of the work assigned on March 30, 2000. N.C. Gen. Stat. § 97-2(6).
6. As a direct and proximate result of the injuries sustained by plaintiff on March 30, 2000, and his resulting medical conditions, plaintiff was unable to work earning the same or greater wages he earned before his injury, or any wages, in his former employment or any other employment since March 30, 2000 and continuing.
7. As a result of his compensable injury by accident, plaintiff is entitled to temporary total disability compensation at the rate of $176.93 per week from March 30, 2000 and continuing until the plaintiff returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
8. Plaintiff has not yet reached maximum medical improvement and remains in the healing period. Plaintiff has not yet been evaluated for any permanent impairment.
9. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability including all treatment recommended by Dr. Howell. N.C. Gen. Stat. §§ 97-2(19), 97-25.
10. If plaintiff is released to return to work by Dr. Howell, he is entitled to have defendants provide him with vocational rehabilitation services in order to assist him in his efforts at achieving functional capabilities, which will enable him to reach a level of stable employability, and then to assist him at locating suitable employment within his work restrictions given by Dr. Howell. N.C.G.S. §§ 97-2(19) 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay temporary total disability compensation to plaintiff at the rate of $176.93 per week for the period from March 30, 2000 and continuing until the plaintiff returns to work or until further Order of the Commission. Compensation due which has accrued shall be paid in a lump sum subject to attorney's fees hereinafter provided.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability. These medical expenses shall include continuing treatment of plaintiff as recommended by Dr. Howell.
3. A reasonable attorney's fee in the amount of twenty-five percent of the compensation due plaintiff under paragraph one of this award is approved for plaintiff's counsel. Thereafter, every fourth check shall be deducted from the sum due plaintiff and paid directly to his counsel.
4. If plaintiff is released to return to work by Dr. Howell, defendants shall provide plaintiff with vocational rehabilitation services in order to assist him in his efforts at achieving functional capabilities, which will enable him to reach a level of stable employability, and then to assist him at locating suitable employment within his work restrictions given by Dr. Howell.
5. Defendants shall pay the costs.
This the 2nd day of December, 2003.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER