CLAYTON COOPER, ADMINISTRATOR OF THE ESTATE OF BETTY SUE COOPER, DECEASED, v. ASHEVILLE CITIZEN-TIMES PUBLISHING COMPANY, INC., FLOYD EDWARD SUMNER AND CLAYTON COOPER, INDIVIDUALLY.

(Filed 1 February 1963.)

**1. Master and Servant § 3—**

A person who exercises an independent employment and contracts to do certain work according to his own judgment and method without being subject to control except as to the result of his work, is an independent contractor; if the employer has the right to control the worker with respect to the manner and method of doing the work, the worker is an employee regardless of whether the employer exercises the right of control or not.

**2. Same—**

The fact that the written contract between the parties designates the worker as an independent contractor is not controlling.

**3. Same— Evidence held for jury on question of whether individual was employee or independent contractor.**

The contract between the parties and the evidence tended to show that the individual defendant was engaged by the corporate defendant to deliver newspapers to subscribers in a definite territory, that the individual used his own truck in performing the work, selected, hired, and paid his own helper, and received as his remuneration the difference between the advertised retail price of a subscription and the lesser price per newspaper specified in the contract. The evidence further tended to show that the delivery of newspapers was a part of the regular business of the corporate defendant, that the individual was bound to sell and deliver the papers promptly to the list of subscribers, that the route and list of subscribers belonged to the corporate defendant, that the corporate defendant had the right to require the individual to meet any reasonable request of a subscriber with reference to the manner in which the newspaper was delivered, and had the right to terminate the contract *instanter* for contract violation and upon 15 days notice for any reason satis-

factory to it, etc. *Held:* In regard to the liability of the corporate defendant for negligent injury to a third person in the operation of the delivery truck, the evidence was sufficient to be submitted to the jury upon the question of whether the individual defendant was an employee or an independent contractor.

**4. Automobiles § 54a—**

In this action to recover for injuries sustained as a result of the alleged negligent operation of a newspaper delivery truck, the evidence *is held* sufficient to be submitted to the jury on the question of whether the person driving the truck, while engaged in the delivery of the newspapers to subscribers, was an employee or an independent contractor of the newspaper publishing company.

APPEAL by plaintiff from *Huskins, J.,* January Civil Term 1962 of BUNCOMBE.

Administrator's action to recover damages for the death of his intestate, Betty Sue Cooper, allegedly caused by the negligent operation of a truck by defendant Sumner while acting for and as agent of the corporate defendant.

About 6:15 a.m. Sunday, July 8, 1956, the intestate was a passenger in an automobile operated by her husband, Clayton Cooper, in a general easterly direction on (dominant) U. S. Highway 19-A. Approximately 1.8 miles east of Sylva, there was a collision between the Cooper car and the Sumner truck within the intersection of 19-A and (servient) Snyder Branch Road. Plaintiff's intestate died from injuries received in said collision.

In separate answers, each defendant denied plaintiff's essential allegations. The corporate defendant alleged, *inter alia,* Sumner was not its agent but an independent contractor operating his own truck in the conduct of his own business; and that the corporate defendant was not liable for the negligence, if any, of Sumner. Sumner alleged, conditionally, a cross action for contribution against Clayton Cooper and caused him to be joined as a defendant in respect of such cross action. Further discussion of the pleadings and the several issues raised thereby is unnecessary to decision of the question presented by this appeal.

Evidence pertinent to the agency issue is stated in the opinion.

At the conclusion of plaintiff's evidence, the court allowed the corporate defendant's motion for judgment of involuntary nonsuit. Thereupon, plaintiff submitted to a voluntary nonsuit as to Sumner. The court then entered judgment of involuntary nonsuit as to the corporate defendant. Plaintiff excepted and appealed.

*Ward & Bennett for plaintiff appellant.*

*Meekins, Packer & Roberts for defendant appellee Asheville Citizen-Times Publishing Company, Inc.*

BOBBITT, J. The evidence, when considered in the light most favorable to plaintiff, was sufficient to require submission of the issue as to whether the death of plaintiff's intestate was proximately caused by the negligence of Sumner. Appellee, in its brief, does not contend otherwise.

The crucial question is whether the evidence, considered in the light most favorable to plaintiff, is sufficient to support a finding that Sumner was acting for and as agent of the Publishing Company as alleged in the complaint. The Publishing Company contends plaintiff's evidence establishes that Sumner was an independent contractor.

The corporate defendant (Publishing Company) publishes two daily newspapers, "The Asheville Citizen" and "The Asheville Times," and the Sunday "Asheville Citizen-Times." When the collision occurred, Sumner was engaged in delivering the "Asheville Citizen-Times" in the territory covered by his (two) written agreements with the Publishing Company.

Pertinent to the crucial question, plaintiff offered in evidence (1) the written agreements, (2) the testimony on adverse examination prior to trial of John R. Marks who, from 1953 until his retirement January 15, 1960, was Circulation Manager of the Publishing Company, and (3) the testimony on adverse examination at trial of Sumner.

Each written agreement bears the caption "Route Agreement." In each, the Publishing Company is designated "first party" and Sumner is designated "second party."

One agreement, relating to the sale and distribution of "The Asheville Citizen" and the Sunday "Asheville Citizen-Times," provides:

"WITNESSETH: That effective on and after Feb. 19, 1956, the first party hereby agrees.

"1. To grant the second party the right to sell and distribute in a manner satisfactory to subscribers and free from control by first party, THE ASHEVILLE CITIZEN and ASHEVILLE CITIZEN-TIMES to regular subscribers, within the territory designated as 'Citizen Route No. 133.'

"2. To furnish second party a list of subscribers, with expiration dates, said list to be in regular order in which papers have been delivered by the former contractor, but order of delivery may be changed by second party.

"3. To sell to second party copies of THE ASHEVILLE CITIZEN, hereinafter known as morning at 2 1/3 cents per copy and copies of ASHEVILLE CITIZEN-TIMES, hereinafter known as Sunday, at 9 cents per copy, to be used in supplying regular subscribers only. Extra copies to be used in making single copy sales are to be sold to second party at ........ cents per copy morning and ........ cents per copy Sunday. Place of delivery shall be at, or near ........ Time of delivery shall be about 3:00 A.M. daily and ................ Sunday. The place, and time of delivery may be changed by first party upon written notice to second party.

"4. To sell second party mail subscriptions, to be sent to points outside Western North Carolina, at a discount of twenty percent from the regular published mail subscription rates, which shall be paid for by second party within three days.

"5. To sell at approximate cost standard route books, receipt blanks, receipt cards, punches, canvas bags, and similar supplies. Supply free of charge start order blanks, stop order blanks, route list blanks, promotion material and, when mutually agreed, sample copies to be used in soliciting new subscriptions.

"6. The first party represents that it maintains for the benefit of all dealers or carriers a system of handling and billing subscribers who desire to pay their subscriptions for long terms in advance. The first party hereby agrees to pay second party at the regular advertised subscription rates for all such subscriptions that are now paid in advance and continue paying said second party for these subscriptions until expiration. The manner of payments shall be by way of crediting the weekly paper bill of second party.

"7. To credit the account of the second party at the regular advertised subscription rates for all subscribers that are now paid in advance with the present or former contractor.

"8. To accept on behalf of second party new and renewal subscriptions, both cash and credit. In so doing the first party is acting as agent or trustee for second party and his subscribers. If the payment shall pay the subscription for less than one month in advance the entire amount shall then and there be credited to the account of second party. If the payment shall pay the subscription for more than one month in advance, second party shall be credited with the earned portion of said subscription and the unearned portion shall be held in trust and credited to his account weekly, as earned.

"The second party hereby agrees:

"a. To act as dealer for THE ASHEVILLE CITIZEN and ASHE-VILLE CITIZEN-TIMES in the territory designated above, and to push the sale of subscriptions to same.

"b. To deliver or cause to be delivered at his own expense promptly upon receipt of his order, copies to subscribers. To pay first party the sum of 15 cents for each missed or incompleted delivery of paper to defray the cost of special delivery regardless of who may be at fault, or for any other default of the second party in his compliance with any provision of this contract.

"c. To purchase from the first party newspapers at rates stated in Paragraph 3 and to pay first party not later than Monday night of each week for all papers furnished during the preceding week. To sell these newspapers to subscribers in his own territory, in accordance with the regular advertised rates.

"d. To furnish only to first party upon request a written list giving correct names with initials and location, street and number, of each and every subscriber, in regular order in which papers are delivered on said route, so as to enable first party to comply with the rules imposed by the Audit Bureau of Circulations, of which first party is a member.

"e. To keep a record of any employees necessary in the fulfillment of this contract and fully comply with the Social Security Act, State Unemployment Compensation Act, State Labor Law and all other laws.

"f. To remit to first party the full amount of any collection that may pay a subscriber for more than one month in advance, to be handled in accordance with Paragraphs 6, 7, and 8. To remit to first party for the benefit of the preceding contractor any money collected for papers delivered by the preceding contractor. And at the termination of this contract, to remit to first party, for the benefit of the succeeding contractor, any unearned subscription payments held by second party.

"g. At the termination of this contract, to return the route together with list of subscribers in as good or better order and condition than when received without any charge or demand upon or against first party or anyone else.

"h. To furnish a cash bond of $500.00, payable $................ in cash and $5.00 weekly until fully paid, which shall serve as security for the fulfillment of this contract, and may be used by first party to pay any debts or obligations due first party or its subscribers. First party shall be under no obligations whatever to release any portion of this cash bond until thirty days have elapsed following last delivery of

papers by second party and not then provided there is apparent cause or reason for claims. The cash bond held on December 31 of any year shall bear interest at the rate of 3% per annum payable at the rate of one quarter of 1% per month for each multiple of $5.00 on hand the first of each month. Said interest money held on December 31 of any year shall be payable between January 15 and 31 of the following year.

"Both parties hereby agree:

"1-a.   That first party may terminate this agreement instanter and without notice whenever second party fails to meet any stipulation in this contract, which cancellation and termination shall not affect its rights against second party for failure of performance; but failure of first party to cancel and terminate shall not constitute a waiver of its right to do so, nor estop it from so doing, in the event of any subsequent default in performance.

"2-b.   Either party may terminate for any reason satisfactory to itself or himself upon 15 days' notice in writing. Regardless of how or by whom termination is made, the second party shall deliver to first party, or some one designated by it, a list of all subscribers and their addresses in regular order in which papers are delivered and shall teach his successor at no expense to first party and without causing any unnecessary delay in delivery of papers on the route; and, if for any reason the second party refuses to teach his successor, the first party shall have the right to apply, from the security furnished by the second party with the first party, guaranteeing performance of this contract, whatever amount is reasonably necessary to defray the expenses of teaching his successor said route.

"3-c.   That the terms of this agreement shall not be changed, modified, altered, or supplemented except in writing, signed by the parties hereto.

|                           | Edward Sumner | (Seal) |
| ------------------------- | ------------- | ------ |
| J. R. Marks               | Address    Sylva, N. C. | |

For ASHEVILLE CITIZEN-
    TIMES COMPANY, INC.
        (Seal)

### "FINANCIAL GUARANTEE

"In order to further secure the ASHEVILLE CITIZEN-TIMES COMPANY against loss under the above and foregoing contract, we

hereby unconditionally guarantee on the part of Edward Sumner the prompt and faithful performance of each stipulation and hereby acknowledge ourselves severally and collectively bounden unto ASHEVILLE CITIZEN-TIMES COMPANY, Incorporated, in the sum of FIVE HUNDRED DOLLARS ($500.00) liquidated damages, jointly and severally, firmly by these presents. We waive notice of any and all defaults on his part.

"Sealed and dated this ........................ day of ................... , A.D. 19....

| Floyd Sumner (Seal) | Ray Cogdill (Seal) |
|---|---|
| Address Sylva, N. C. | Address Sylva, N. C. " |

The other agreement, relating to the sale and distribution of "The Asheville Times" and the Sunday "Asheville Citizen-Times" is different only in the following respects: (1) In lieu of "The Asheville Citizen" the words "The Asheville Times" appear; (2) in paragraph 1, the territory is designated "Times Route No. T-133"; (3) in paragraph 3, (a) after "Place of delivery shall be at, or near," the words "Sylva Drive-In" are written, and (b) after "Time of delivery shall be about," "2:30 P.M." is written; (4) in paragraph b, in lieu of "15 cents"—"25 cents" appears; (5) paragraph h begins as follows: "To furnish a cash bond of $300.00, payable $ ........ . .. .. in cash and $3.00 weekly until fully paid," etc.; and (6) the "Financial Guarantee" is signed by Ray Cogdill and David Parker.

There was testimony tending to show the facts narrated below.

The territory covered by each "Route Agreement" extended along U. S. Highway No. 19-A (and certain side roads) from Balsam Gap (7-8 miles east of Sylva) to Whittier (2 miles west of Sylva) and included the town of Sylva. The route carrier's "average draw of papers was about 300 on the Times and possibly 400 on the Citizen."

Sumner was approached by G. L. Crisp to succeed one Jamison as carrier on an established newspaper route. Mr. Crisp, a full time employee, was the Publishing Company's District Supervisor. Mr. Marks testified: "The District Representative determined whether or not a certain applicant for a carrier's job would be employed or who would be given a route."

The Publishing Company (as provided in paragraph 2) furnished Sumner "a list of subscribers, with expiration dates, . . . in regular order in which papers (had) been delivered by the former contractor (Jamison)," but Sumner was free to change the "order of delivery." Before signing the agreements, Sumner made two or three trips over

the route with Jamison. It was "obvious" that the "quickest and short-est way" to deliver the newspapers was "in the order in which (the names and addresses) appeared on the route list." Sumner testified: "The most intelligent and only logical, practical way to deliver them was from house to house right down the road."

The newspapers were delivered to Sumner "in bulk, bailed *(sic)* with a wire, with *(his)* name on them and the number of papers at the two delivery points in or near Sylva." They were delivered to Sumner by a truck of Citizen Express Company, a subsidiary of the Publish-ing Company. Crisp told Sumner he was to pick up "The Citizen" at 3:00 a.m. at the Cannon Shell Station in Sylva; that he was to pick up "The Times" (at 2:30 p.m.) at the Sylva Drive-In Theatre; and that the newspapers were "to be delivered at the earliest possible moment in the shortest time." "(D)elivery was usually completed by 6:30 unless there was snow or bad weather of some sort." Sumner was to complete delivery "just as quick as (he) could get through."

Sumner agreed (as provided in paragraph c) to sell the newspapers "in his own territory, in accordance with the regular advertised rates," to wit, 5 cents per copy for each of the daily newspapers and 15 cents per copy for the Sunday newspaper. In this connection, it is noted that the "(w)holesale rates varied among carriers" and were "determined to some extent by the length of the route the carrier had to traverse and the difficulty of the route, the type of terrain," etc.

When Sumner received from the Publishing Company a "Start Order," indicating a new subscriber by direct contact with the Pub-lishing Company, he was instructed by Crisp to start delivery to this subscriber immediately. When he received a "Stop Order" from the Publishing Company, he could stop delivery immediately or assume the risk by extending credit.

Sumner met with Crisp once a week, primarily "for weekly settle-ment." On such occasions Crisp would discuss with Sumner "problems or changes of policy on the part of the paper." Also, Crisp "would tell (Sumner) he had complaints from people on (his) route and that (he) was going to have to give them service more in line with what they desired than what (he) had been doing." Sumner testified: "Those complaints usually arose from the fact the paper would not be in the place where the customer wanted it, or would be late. When Mr. Crisp told me about these complaints and who the customers were then I attempted to improve the service as far as these customers were concerned. I knew that Mr. Crisp could terminate this contract at any time."

Sumner also received from time to time from the Publishing Com-pany notice (on a special form) of complaints the Publishing Com-

pany had received from subscribers. Mr. Marks testified: "If a particular carrier did not pay attention to the complaint forms which we forwarded to him and continued to make the same mistakes, the result would depend—if he just simply didn't do anything about any of them why naturally we reserve the right to terminate his contract any time we saw fit; any reason satisfactory to himself or ourself, both had the same right."

Sumner was required to purchase "at approximate cost" certain supplies including receipt books bearing the name "Citizen-Times."

The Publishing Company furnished the route carriers "round yellow and black boxes" then in use in the Sylva area "bearing the name Asheville Citizen-Times," suitable for use as a depository for the newspaper upon delivery by the carrier. Many of these had been placed and were in use when Sumner took over the route from Jamison. When Mr. Crisp was explaining Sumner's duties, Jamison (in Crisp's presence) told Sumner that he "was supposed to put them (the newspapers) in the boxes." If Sumner, upon request of subscribers or otherwise, wanted additional boxes for such use, he obtained them from the Publishing Company without cost to him.

Deliveries to subscribers were made at Sumner's expense. Such deliveries required the use of an automobile or truck Sumner bought a truck for this specific purpose and paid all expenses in connection with the maintenance and operation thereof. Too, Sumner selected, hired and paid a helper. Sumner testified: " I picked him up myself and paid him out of my own pay, out of my own commissions or earnings —out of my receipts from my subscribers, let's put it." Sumner also testified: "I never missed serving my route while I was with them."

What Sumner received for his services, and all that he received, was the difference between the price he paid for the newspapers and "the regular advertised rates" at which they were sold. The number of newspapers delivered to him approximated the current number of subscribers. Sumner paid for all he received. Approximately five or six per cent of the subscribers made prepayment to the Publishing Company. Collections from the remaining subscribers were made by Sumner and any loss on account of failure to collect fell on him.

Sumner was not carried on the payroll or other records of the Publishing Company as an employee. The Publishing Company paid no withholding, social security or unemployment tax or contribution on account of Sumner. Nor was Sumner covered by the Publishing Company's workmen's compensation insurance.

"In its simplest form an independent contractor may be said to be one who exercises an independent employment and contracts to do

certain work according to his own judgment and method, without being subject to his employer except as to the result of his work. (Citation) When one undertakes to do a specific job under contract and the manner of doing it, including employment, payment and control of persons working with or under him, is left entirely to him, he will be regarded as an independent contractor unless the person for whom the work is being done has retained the right to exercise control in respect to the manner in which the work is to be executed. (Citation) The test is whether the party for whom the work is being done has the right to control the worker with respect to the manner or method of doing the work, as distinguished from the right merely to require certain definite results conforming to the contract. If the employer has right of control, it is immaterial whether he actually exercises it. (Citation)" Devin, J. (later C.J.), in *McCraw v. Mills, Inc.*, 233 N.C. 524, 526, 64 S.E. 2d 658, and cases cited; *Hinkle v. Lexington*, 239 N.C. 105, 79 S.E. 2d 220; *Pearson v. Flooring Co.*, 247 N.C. 434, 101 S.E. 2d 301; *Pressley v. Turner*, 249 N.C. 102, 105 S.E. 2d 289.

In *Hayes v. Elon College*, 224 N.C. 11, 29 S.E. 2d 137, Barnhill, J. (later C.J.), sets forth a number of elements which ordinarily tend to identify an "independent contractor" as distinguished from a "servant" or "employee." He then states: "The presence of no particular one of these *indicia* is controlling. Nor is the presence of all required. They are considered along with all other circumstances to determine whether in fact there exists in the one employed that degree of independence necessary to require his classification as independent contractor rather than employee."

According to the written agreements, Sumner (referred to therein as "dealer") was granted the right to sell and distribute the newspapers in a manner satisfactory to subscribers, "free from control" of the Publishing Company. This "contractual declaration" is not determinative. *Watkins v. Murrow*, 253 N.C. 652, 657, 118 S.E. 2d 5. "... a master, if he actually be such, cannot exonerate himself from his legally imposed liability to a third person for injury resulting from the misconduct of a servant by the simple expedient of 'contracting' with the servant that he is to be free from the master's control." *Femling v. Star Pub. Co.* (Wash.), 81 P. 2d 293.

Factors *(indicia)* tending to support the view that Sumner was an employee, servant *or* agent of the Publishing Company include the following:

The work Sumner was engaged to do, *i.e.*, deliver newspapers to subscribers, was a "part of the regular business of the employer," to wit, the Publishing Company. Restatement, Agency § 220(2) (h). As

aptly stated by Hall, J., in *Laurel Daily Leader v. James* (Miss.), 80 So. 2d 770: "The delivery of newspapers within a reasonable time after publication is essential to the success of the newspaper business. For the greater portion of its income the paper depends on advertising, and the rates for advertising are goverened by the paper's circulation. Circulation is a necessity for success. The delivery boys are just as much an integral part of the newspaper industry as are the type-setters and pressmen or the editorial staff." When engaged in de-livering the Publishing Company's newspapers to subscribers, Sum-ner's services were rendered in the main stream and in furtherance of the Publishing Company's business.

In *Shearman* and *Redfield* on Negligence, Revised Edition, Vol. One, § 168, this statement appears: "The true test of an 'independent con-tractor' would seem to be, that he renders the service in the course of an independent occupation, representing the will of his employer only as to the *result* of his work, and not as to the means by which it is accomplished." In 27 Am. Jur., Independent Contractors § 2, the author states: "Examination of the definitions substantially adopted by most of the courts makes it evident that one of the basic elements of the independent contractor relationship is the fact that the con-tractor has an independent business or occupation." Whether the per-son employed "is engaged in an independant business, calling, or oc-cupation," is recognized by this Court as a significant factor in de-termining whether the relationship is that of "independent contractor." *Hayes v. Elon College, supra.* Also, see Restatment, Agency, § 220 (2) (h).

Sumner was twenty years of age when he became route carrier for the Publishing Company. His distinctive prior occupation was that of brakeman on the Southern Railway. Although "cut off" by the railroad during the whole time he was working "with the paper," he retained his seniority "with the Union and with the Railroad." He was "just temporarily off and subject to being called back" and later was called back.

Whatever title Sumner may have acquired in the newspaper when delivered to him by the Publishing Company, *"he was bound by con-tract to sell and deliver the papers promptly to a list of subscribers which was the property of the (Publishing Company) and to repeat the process daily." Journal Pub. Co. v. State Unemployment Comp. Com'n.* (Or.), 155 P. 2d 570. Indeed he was subject to penalty ( see paragraph b) if he failed to do so. The agreements recognized that the route and the list of subscribers belonged to the Publishing Company. *Hann v. Times-Dispatch Pub. Co.* (Va.), 184 S.E. 183. The Publishing

Company delivered to Sumner the list of subscribers when he became the carrier on its route. When the agreements were terminated, he was obligated to surrender the route and (current) list of subscribers to the Publishing Company and had no further interest of any kind therein.

When and how Sumner was to perform his obligations to the Publishing Company were fixed in large measure by the terms of the agreements. Delivery in a manner "satisfactory to subscribers" (as provided in paragraph 1) was required. It would seem the Publishing Company had the legal right to require that Sumner meet any reasonable request of a subscriber with reference to the manner in which he delivered the newspaper. Moreover, the possible variations in respect of the manner in which a newspaper might be delivered to the residence of a subscriber are somewhat limited. *De Monaco v. Renton* (N.J.), 113 A. 2d 782.

The Publishing Company had the legal right to terminate the agreements (1) *instanter* for contract violation, and (2) for any reason satisfactory to it "upon 15 days' notice in writing." As stated by Schenck, J., in *Lassiter v. Cline,* 222 N.C. 271, 274, 22 S.E. 2d 558: "Certainly the 'right to fire' is one of the most effective methods of control . . ." If Sumner failed to comply with whatever instructions the Publishing Company might give as to the method and manner of delivering the papers he would thereby risk termination of his agreements as route carrier.

It is noted that the services Sumner was required to render were routine in nature, requiring diligence and responsibility rather than discretion and skill. Ordinarily, the day by day sale and delivery of newspapers under a cancellable agreement of indefinite duration may not be considered "a specific job under contract" within the meaning of that phrase when used in defining an independent contractor.

The fact that Sumner had authority to select and hire and did select and hire a helper is not determinative. *Evans v. Lumber Co.,* 174 N.C. 31, 93 S.E. 430; *Lassiter v. Cline, supra.* Clark, C.J., in *Evans v. Lumber Co., supra,* said: "It is said in 14 R.C.L., 72, that it is idle and vain to assert that an employee is an independent contractor because he has the sole right to hire and discharge his help when his own employer has the unquestioned right to terminate the contractor's employment at will."

Decisions (conflicting) in other jurisdictions, bearing upon the question here presented, are discussed in 53 A.L.R. 2d 183, in an annotation entitled "Route driver or salesman as independent contractor or employee of merchandise producer or processor, for purposes of respondeat superior doctrine."

The Publishing Company stresses our decision in *Creswell v. Publishing Co.*, 204 N.C. 380, 168 S.E. 408, in which this Court held a fourteen-year old newsboy who made street sales under the arrangement therein stated was not an "employee" within the definition set forth in our Workmen's Compensation Act. Suffice to say, whether Sumner was an employee within the meaning of the Workmen's Compensation Act is not presented or decided.

Decision here is based upon our conclusion that the evidence, when considered in the light most favorable to plaintiff, is sufficient to support a finding that Sumner, *when engaged in delivering the Publishing Company's newspapers to subscribers,* was acting as the Publishing Company's agent and in furtherance of its business. Hence, the judgment of involuntary nonsuit is reversed.

Reversed.