**Alice K. SHARPE, Plaintiff,**

v.

**Ronald K. GRINDSTAFF, Sr., et al., Defendants.**

**Juanita SHARPE, by her Next Friend, H. L. King, Plaintiff,**

v.

**Ronald K. GRINDSTAFF, Sr., et al., Defendants.**

**Nos. C-157-WS-67, C-130-WS-68.**

United States District Court, M. D. North Carolina, Winston-Salem Division.

Sept. 24, 1970.

Fred S. Hutchins, Fred S. Hutchins, Jr., and Philip B. Whiting, of Deal, Hutchins & Minor, Winston-Salem, N. C., for plaintiffs.

Perry .C. Henson, Greensboro, N. C., for defendants, Ronald K. Grindstaff, Sr., Ronald K. Grindstaff, Jr., and Leonard Ross Lewis.

Richmond G. Bernhardt, Jr., of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., and William F. Womble, of Womble, Carlyle,. Sandridge & Rice, Winston-Salem, N. C., for defendant, Bradley Lumber Co., Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, District Judge.

The morning of November 25, 1966, was clear and cool. The sun shone brightly; the road was dry. Alice Sharpe and her minor daughter, Juanita, and other members of the family, were traveling homeward to Atlanta along U.S. Highway 29 Bypass (Temporary I–85). About 8:30 they neared a point outside Lexington, North Carolina, where U.S. 29–A returns from the business district to reunite in a "Y" configuration with U.S. 29.

In that moment, having finished breakfast at a nearby truck stop, Leonard Ross Lewis drove his flat bed trailer-tractor rig, empty, onto 29–A, and proceeded also in a southerly direction. He approached the merger point from the left just as the Sharpe automobile, driven by Mrs. Sharpe, approached from the right.

A double yellow line, running approximately 365 feet divided the two southbound lanes. The vehicles met and rode along side by side, each on its own half of the road, each observing the proper speed limits. When the yellow lines stopped and a broken white line began, Lewis checked his rear view mirror. Unable to see the car hidden in his mirror's blind spot, he flashed his right turn signal and immediately began to change into the right lane. As he crossed the dividing lines, his right front fender struck the automobile's left rear quarter panel. Momentarily, the two vehicles seemed hooked together. The truck jackknifed; and, as it did, the car shot forward, angling the right lane. It crashed into a bridge abuttment, bounced off and came to rest with the remains of a front end pointed north.

Drivers of two following cars witnessed the event. Floyd Mock Leonard managed to brake quickly and avoid involvement. The other vehicle, driven by Mrs. Martha Sink Church, was traveling slowly, far enough behind to remain outside the area of immediate peril. From the evidence, it is found that Mrs. Sharpe

was alongside the cab of the truck before the defendant Lewis gave a signal of his intention to turn and Mrs. Sharpe was in such position that she could not see the turn signals.

Mrs. Sharpe and Juanita were both thrown from the automobile. Mr. Leonard and some of the gathering crowd administered first aid. Someone else called an ambulance. Badly hurt and suffering from multiple injuries, they were rushed to a local hospital and later transferred to the North Carolina Baptist Hospital in Winston-Salem where they underwent extended periods of convalescence.

Alice Sharpe and Juanita Sharpe, by her next friend, brought actions to recover damages for medical expenses, permanent injuries and pain and suffering. The cases were consolidated and tried before the Court without a jury. The facts, as found, are set out here and in the discussion which follows.

## DISCUSSION

The three topical issues at hand and the order in which they will be discussed are: I. Negligence; II. Agency; and III. Damages.

■ Since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts sitting in civil actions by virtue of diversity jurisdiction have applied the substantive law of the forum state. Hanes Dye and Finishing Co. v. Caisson Corp., 309 F.Supp. 237 (M.D.N.C.1970).

### I. NEGLIGENCE

■ Negligence in North Carolina is defined as

"[T]he failure to exercise that degree of care for others' safety which a reasonably prudent man, under like circumstances, would exercise, and may consist of acts either of commission or omission." [1]

North Carolina General Statute § 20-154 provides in pertinent part:

"(a) the driver of any vehicle upon a highway before * * * turning from a direct line shall first see that such movement can be made in safety, and * * * whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement. * * *

"[T]he violation of this section shall not constitute negligence per se."

■ The duties imposed upon the driver intending to turn from a direct line are twofold: (1) he must first ascertain whether the move can be made in safety and (2) upon ascertaining that another vehicle might be affected, must give a signal, plainly visible, of his intention so to move. Clarke v. Holman, 274 N.C. 425, 163 S.E.2d 783 (1968); Porter v. Philyaw, 204 F.Supp. 285 (W. D.N.C.1962).

■ Since a violation of this safety statute is not negligence per se, triers of the facts must consider all relevant facts and attendant circumstances in deciding whether the violator has breached his common law duty to exercise due care. Kinney v. Goley, 4 N.C.App. 325, 167 S.E.2d 97 (1969).

■ The relevant facts and attendant circumstances are these: Lewis had been a truck driver for twenty-seven years. He had driven this particular tractor-trailer unit for about five months prior to the accident. He was well aware that along the right side of his truck was an area known as the "blind spot" (which tests involving this unit showed to be between 31 and 41 feet depending upon mirror adjustment) and that objects located within this blind spot were not picked up by the mirror. He had driven that section of highway frequently and was familiar with its hazards.

In failing to ascertain whether another vehicle might be present, hidden within the blind spot, Lewis failed to exercise due care before pulling into the right lane. As a proximate result of that failure, the collision in question occurred.

1. Strong, 6 N.C. Index 2d 3, 4.

## II AGENCY

R. K. Grindstaff and Ronnie Grindstaff transacting business as "R. K. Grindstaff and Son," a partnership, readily admit that at the time of the collision Leonard Ross Lewis was employed by them and that he was driving their truck within the course of his employment. Thus, under the doctrine of *respondeat superior* they, as well as Lewis, are liable for whatever damages plaintiffs might be awarded. Jackson v. Mauney, 260 N.C. 388, 132 S.E.2d 899 (1963).

The plaintiffs contend that Lewis, likewise, was an employee of Bradley Lumber Company, Inc., of Marion, North Carolina. It was Bradley's lumber that Lewis had hauled to Lexington upon Grindstaff's truck and unloaded early on the morning of the wreck.

During the trial, evidence unfolded a rather unique business arrangement between Lewis, the Grindstaffs, and Bradley Lumber Company, Inc. Included among the pertinent facts are the following: Ronnie Grindstaff was a nephew of Pierce Bradley, Jr., the president and sole shareholder of Bradley Lumber Company, Inc. Before going into business for himself, Ronnie had worked for Mr. Bradley. He was one of three incorporators of Bradley Lumber Company, Inc., a director,[2] and vice president. He owned no stock[3] and on November 25, 1966, and for sometime before, performed no duties for the company.

Ronnie Grindstaff and his father transacted business under a verbal partnership agreement. The business consisted primarily of trucking and of sawmilling. Ronnie supervised the trucks (which were registered in his name) and his father supervised the sawmilling operations. One of the three tractor-trailer units owned by the partnership was, on November 25, 1966, under lease to Bradley Lumber Company, Inc.[4] The partnership sold lumber to Bradley, though Bradley obtained lumber from several sources and the Grindstaffs sold to other customers, as well as to Bradley. A large portion of Grindstaff's trucking business consisted of contract hauling for Bradley, though on occasion, Bradley also contracted with other trucking companies.[5] Bradley owned no financial interest in the Grindstaff operation.

Weekly, Ronnie received a check for $80.00 drawn on Bradley Lumber Company, Inc. Lewis received all of his compensation, except reimbursement for expenses, by checks drawn on Bradley Lumber Company, Inc. Usually, on Thursday nights Lewis would meet with Ronnie to report road hours and miles driven the previous week. Ronnie would calculate Lewis' wages and pass that figure on to Bradley who in turn would draw a check payable to Lewis on Bradley Lumber Company, Inc., in that amount. The number of hours and miles included also those spent working on jobs other than Bradley contract hauls. Bradley would then deduct the total amount, plus 10 per cent handling from what it owed R. F. Grindstaff and Son for the leased truck and for contract hauls and give R. F. Grindstaff and Son a check for the remainder.

2. When Bradley Lumber Company, Inc., was incorporated, January 14, 1964, North Carolina required that there be no fewer than three incorporators (G.S. § 55–6) and no less than three directors (G.S. § 55–25). Beside Pierce, Jr., and Ronnie, the other incorporator and director was Mrs. Marion Bradley, wife of Pierce, Jr.

3. It was permissible under North Carolina law for one person to acquire all stock shares without impairing the corporation's existence (G.S. § 55–3.1). Of the 1500 shares of Bradley common stock on January 15, 1964, one share was given to Marion Bradley and one to Ronnie Grindstaff. This was done on the advice of counsel, the shares being returned later that day to Pierce Bradley, Jr.

4. This was not the truck involved in the collision.

5. The leased truck cost Bradley 60 cents per loaded mile and the contract hauls 66 cents per loaded mile. Lewis averaged driving between 700 to 1,000 miles per week, hauling both to and from Bradley's yard on a contract basis.

Being on the payroll entitled both Ronnie and Lewis to participate in Bradley's group health and group life insurance programs. And because they appeared on the payroll, they were reported as employees to the Federal Government for purposes of income taxation and to the State of North Carolina for income taxation and Workman's Compensation.

Because of the records made pursuant to the above, it appears on paper that Ronnie and Lewis were both employees of Bradley. However, the inclusion of their names on the payroll was in the nature of an accommodation, entitling them to participate in insurance plans which, due to the size of Grindstaff's operation, would not otherwise have been available. Ronnie Grindstaff personally hired Lewis, set his wages, and was the only person exercising supervisory authority over him. He alone authorized trips and assigned routes. Though Bradley could have ceased doing business with the Grindstaff partnership, he could not have terminated Lewis' employment with Grindstaff.

 In relation to Bradley Lumber Company, Inc., Ronnie Grindstaff stood as an independent contractor. What was said by Justice Devin in Mc-Craw v. Calvine Mills, Inc., 233 N.C. 524, 526, 64 S.E.2d 658, 660 (1951) and quoted by Justice Bobbitt in Cooper v. Asheville Citizen-Times Publishing Co., Inc., 258 N.C. 578, 129 S.E.2d 107, 113 (1963) applies here:

"In its simplest form an independent contractor may be said to be one who exercises an independent employment and contracts to do certain work according to his own judgment and method, without being subject to his employer except as to the result of his work (cites omitted). *When one undertakes to do a specific job under contract and the manner of doing it, including employment, payment and control of persons working with or under him, is left entirely to him, he will be regarded as an independent contractor unless the person for whom the work is being done has retained the right to exercise control in respect to the manner in which the work is to be executed.* (cites omitted) The test is whether the party for whom the work is being done has the right to control the worker with respect to the manner or method of doing the work, as distinguished from the right merely to require certain definite results conforming to the contract. If the employer has right of control, it is immaterial whether he actually exercises it. (cites omitted)." (Emphasis added.)

Since Bradley Lumber Company, Inc., retained no control over Lewis or Grindstaff as individuals nor over their method of operation, the corporation cannot be considered their employer. Bradley Lumber Company, Inc., therefore, is not liable for the negligence of Lewis on November 25, 1966.

### III. DAMAGES

The evidence stands uncontradicted that both Mrs. Sharpe, then forty-one years of age, and Juanita, then eleven years of age, were in good health prior to the accident.

Among her injuries, Mrs. Sharpe sustained a compound fracture of the right distal femur and right proximal tibia, a tear of the lateral meniscus of the right knee, laceration of the right patellar tendon, lacerations of the right forehead, left arm, left hip, left thigh, left calf, lower right leg, and lateral side of the left calf, a mid shaft comminuted fracture of the right ulna, fracture of the right oscalsis (heel bone) and multiple rib fractures bilaterally with a pneumothorax on the right.

The oscalsis did not heal perfectly and it was necessary for Mrs. Sharpe to wear a corrective shoe. The motion in her right knee is restricted and the prognosis there is somewhat bleak, with a possibility of degenerative arthritis later developing.

On July 3, 1967, the scars on her face and right knee were surgically revised; but according to the surgeon, there

would still be some degree of permanent residual scarring at these sites.

Included among Juanita's injuries were the following: a craniofacial disjuncture, a comminuted fracture of the mandible with loss of several teeth, a transverse mid shaft fracture of the left femur, a left brachial plexus paralysis, cerebral contusion, facial and scalp lacerations, fractures of the nasal bones, right zygomatic arch and left acetabulum, with a pneumothorax bilaterally.

An injury to the left shoulder girdle has resulted in a partial paralysis of a permanent type.

Injuries to the mouth area have necessitated quite an extensive orthodontic program.

Facial scarring was serious and required plastic surgery. Some residual scarring remains in that area, as well as two scars upon the cheeks where wires were extended from within the oral region to an external headgear apparatus.

Alice K. Sharpe and Juanita Sharpe were hospitalized nearly four months each and during this time were examined and treated by several physicians and specialists.

The plaintiffs are entitled to recover as damages for injuries one compensation in a lump sum for all injuries, past and prospective, from those defendants found negligent. Hunter v. Fisher, 247 N.C. 226, 100 S.E.2d 321 (1957). After giving effect to this rule and carefully considering the nature and extent of the personal injuries sustained by the plaintiffs, it is found that Alice K. Sharpe is entitled to recover of the defendants, save and except Bradley Lumber Company, Inc., the sum of $50,000.-00, together with court costs expended; and it is found that Juanita Sharpe, acting by her next friend, H. L. King, is entitled to recover of the defendants, save and except Bradley Lumber Company, Inc., the sum of $65,000.00, together with court costs expended.

In summary, it is concluded that Alice K. Sharpe and Juanita Sharpe, as a proximate result of the negligence of Leon-

ard Ross Lewis, suffered severe and multiple injuries; that Leonard Ross Lewis, when the collision in question occurred, was acting within the scope of his employment for R. K. Grindstaff and Son; that there was no agency relationship either between Lewis and Bradley Lumber Company, Inc., or between the Grindstaffs and Bradley Lumber Company, Inc., and that Alice K. Sharpe was not contributorily negligent in the driving of her automobile.

The foregoing shall constitute findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

Counsel for the plaintiffs will prepare and submit to the Court an appropriate judgment, first presenting same to counsel for the defendants for approval as to form.