PET, INC. v. THE UNIVERSITY OF NORTH CAROLINA, CARL L. MANUEL AND LYNGLAS ENTERPRISES, LTD.

No. 8318SC1092

(Filed 28 December 1984)

**1. Sales § 1.1; Principal and Agent § 4— federal regulations—alleged principal to be financially responsible—not applicable to subcontractor**

Summary judgment was properly granted for defendant in an action by a subcontractor for monies due under a contract to supply milk to defendant's contractor from a federally funded Summer Food Service Program for Children for which defendant served as a local sponsor. Federal regulations delineating defendant's complete financial responsibility for program operations governed only the relationship between defendant and the state agency responsible for reimbursing defendant, and did not expand defendant's common law contractual liability to encompass liability to contractors with whom defendant had no privity.

**2. Sales § 1.1; Principal and Agent § 4— detailed contract provisions—no grant of authority—no agency**

Summary judgment was properly granted for defendant in an action by a subcontractor to recover monies due under a contract to supply milk to defendant's contractor under a federally funded summer lunch program. There was no evidence of an express or implied grant of authority and detailed provisions of the contract between the defendant and the contractor regarding the manner of performance were guidelines to insure results which did not transform the contractor into an agent of the defendant.

**3. Principal and Agent § 4.2— out of court statements of alleged agent—inadmissible**

In an action by a subcontractor against the local sponsor of a summer lunch program, statements by the contractor that it had agreed as an agent of the defendant to pay for delivery of milk did not create a genuine issue of fact as to agency. Evidence of an alleged agent's out of court declarations is inadmissible to establish agency without other evidence to establish the fact of agency.

APPEAL by plaintiff from *Hamilton H. Hobgood, Judge.* Judgment entered 6 June 1983 in Superior Court, GUILFORD County. Heard in the Court of Appeals 22 August 1984.

*Boone, Higgins, Chastain & Cone, by Robert C. Cone, for plaintiff appellant.*

*Attorney General Edmisten, by Associate Attorney General Thomas J. Ziko, for defendant appellee.*

BECTON, Judge.

This case deals with the liability of the defendant, the University of North Carolina (UNC), for milk supplied by the plaintiff, Pet, Inc. (Pet), to the federally-funded Summer Food Service Program for Children (SFSPC), sponsored in Greensboro by UNC's constituent institution, North Carolina Agricultural and Technical State University (A&T).

In 1976, the federal government funded a Summer Food Service Program for Children, 42 U.S.C. Sec. 1761 (Supp. 1984), as established by the National School Lunch Act, 42 U.S.C. Secs. 1751-1763 (1973 & Supp. 1984). The program is administered by the U.S. Department of Agriculture (USDA) for the purpose of providing nutritional help, based on need, to school-aged children during the summer months. The USDA distributes the operating funds to state agencies, which in turn reimburse the local sponsors for the meals served. The regulations, promulgated by the USDA to govern the administration of the entire program and in effect at the time these events occurred, are codified at 7 C.F.R. Secs. 225.1 - .18 (1978).

In June 1977, A&T signed an agreement with the North Carolina Department of Public Instruction (DPI) (the state agency in charge of reimbursement) to participate in the SFSPC as a sponsor. As a sponsor, A&T had the option to contract with a " 'food service management company' . . . to manage, or to prepare, or to deliver, or to serve, or any combination, thereof, unitized meals, with or without milk." 7 C.F.R. Secs. 225.2(m) and - .11 (1978). A&T contracted with Lynglas Enterprises, Ltd. through Carl L. Manuel, Treasurer, to prepare and deliver meals including milk to the designated locations from 13 June 1977 to 19 August 1977. Manuel contracted with Pet to supply the required milk.

Pet instituted this action against UNC, Lynglas and Manuel after Manuel/Lynglas failed to pay the $18,557.76 due for the milk supplied. Pet obtained a default judgment against Lynglas and took a voluntary dismissal without prejudice against Manuel, pursuant to Rule 41(a)(1) of the North Carolina Rules of Civil Procedure.

The action comes before this Court on the remaining two parties' cross-motions for summary judgment. From the order granting UNC's motion and denying Pet's motion, Pet appeals.

I

Summary judgment is appropriate once a party establishes that (1) there is no genuine issue of fact, and (2) it is entitled to judgment as a matter of law. N.C. Gen. Stat. Sec. 1A-1, Rule 56(c) (1983); *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980). On appeal, Pet contends that the trial court erred in granting summary judgment in favor of UNC, because UNC failed to establish that it was entitled to judgment as a matter of law. Pet relies on three alternate legal theories to establish UNC's liability: (1) A&T's non-delegable administrative and financial responsibility for the entire program, as provided by the federal statutory and regulatory scheme; (2) Manuel's express or implied authority to act as A&T's agent in negotiations with Pet; and (3) Manuel's apparent authority to act as A&T's agent. We are not persuaded by Pet's arguments. After reviewing the pleadings, answers to interrogatories, and other discovery materials, we conclude that the trial court did not err in granting summary judgment in favor of UNC.

II

[1] By signing the agreement to participate as a sponsor in the SFSPC, A&T agreed to comply with the regulations promulgated by the USDA, as codified at 7 C.F.R. Sec. 225.1 - .18 (1978), as well as with any USDA handbooks issued under the above regulations. 7 C.F.R. Sec. 225.9(1) (1978). Pet mistakenly relies on the federal regulations to establish A&T's liability, as the sponsor, to Pet, a subcontractor. In fact, the regulations only govern the relationship between the sponsor and the state agency.

The regulations, included in the plaintiff's brief, and the 1977 edition of the USDA SFSPC Sponsor Handbook, Defendant's Exhibit 1, delineate A&T's complete financial responsibility for program operations. A sponsor is not eligible to participate in the program unless it:

Demonstrates financial and administrative capability for Program operations and accepts final financial and adminis-

trative responsibility for total Program operations at all sites at which it proposes to conduct a food service; . . .

7 C.F.R. Sec. 225.9(a)(1) (1978). The non-delegable nature of A&T's financial responsibility is demonstrated unambiguously in the procurement provisions of the regulations, as codified at 7 C.F.R. Sec. 225.15 (1978). Although A&T has the authority to procure goods and services for use in the Program by contracting with "responsible contractors" who may subcontract with other contractors, 7 C.F.R. Sec. 225.15(a)(3)(v) and (a)(4) (1978), A&T remains

> the responsible authority without recourse to the State agency regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered into under the Program. This includes disputes, claims, protests of award, source evaluation or other matters of contractual nature.

7 C.F.R. Sec. 225.15(a)(6) (1978).

However, A&T as the sponsor, only bears the "contractual responsibilities arising under *its* contracts." *Id.* (Emphasis added.) The sponsor's acceptance of "final financial and administrative responsibility for total Program operations," 7 C.F.R. Sec. 225.9(a)(1) (1978), and the non-delegable nature of that financial responsibility, as described in the USDA Handbook, *supra*, at 3, refer only to the sponsor's potential reimbursement for operation costs by the State agency. In other words, if A&T commits itself contractually to costs which are not properly reimbursable by the state agency under the federal regulations, and is, nevertheless, reimbursed and pays its contractors, it still remains liable to the state agency for the improperly reimbursed costs.

Thus, the federal regulations do not expand A&T's common-law contractual liability to encompass liability to subcontractors. The bidding provisions in the USDA Handbook, *supra*, reflect this clearly. Although sponsors may accept bids from vendors who will have "to secure certain food items [including milk] from commodity distributors," they cannot accept a vendor who will in turn subcontract the "meal assembly functions." *Id.* at 39. The rationale given is: "[s]ubcontracting places the company immediately responsible for the quality and supply of meals beyond the direct contractual control of the sponsoring organization." *Id.* Pet, as a

subcontractor in privity of contract only with Lynglas, has no remedy against UNC under the federal regulations cited.

## III

[2] Based on the "magnitude of detail specified in the contract" between A&T and Lynglas and the degree of control A&T thereby exercised in its relationship with Lynglas, Pet contends that Lynglas acted as A&T's agent in its dealings with Pet, rendering UNC liable on Pet's claim. We find that Lynglas had no express or implied authority to serve as A&T's agent.

Pursuant to 7 C.F.R. Sec. 225.5(d) (1978), each state agency, in this case, the DPI, must develop a "standard form of contract for use by sponsors and food service management companies." The USDA further requires that the sponsor/food service management company contract include, at minimum, the following provisions:

(1) The sponsor shall provide the food service management company with a list of approved food service sites and shall update the list as needed;

(2) The food service management company shall maintain such records (supported by invoices, receipts, or other evidence) as the sponsor will need to meet its responsibilities under this part, and shall report thereon to the sponsor promptly at the end of each month, at a minimum;

(3) The food service management company shall have State or local health certification for the facility in which it proposes to prepare meals for use in the Program and it shall ensure that all health and sanitation requirements are met at all times;

(4) The books and records of the food service management company pertaining to the sponsor's food service operation shall be available for a period of 3 years from the date of receipt of final payment under their contract with the sponsor for inspection and audit by representatives of the State agency, of the Department, and of the United States General Accounting Office at any reasonable time and place;

(5) Unitized meals shall be delivered in accordance with a delivery schedule prescribed in the contract;

(6) Increases and decreases in the number of meal orders may be made by the sponsor, as needed, within a period of prior notice mutually agreed upon;

(7) No payment shall be made for meals that do not meet nutritional requirements, are spoiled or unwholesome at time of delivery, or do not otherwise meet the requirements of the contract;

(8) All meals shall meet the requirements of Sec. 225.10; [portion, size, meal composition]

(9) Nonperformance shall subject the food service management company to specified sanctions.

7 C.F.R. Sec. 225.11(b) (1978).

The solicitation/contract into which A&T and Lynglas entered, defendant's Exhibit 4, incorporated the above provisions as well as provisions specifying the individual meal packaging, the meal preparation time prior to delivery, the food quality, the menu cycle, and A&T's "right to suggest menu changes within [Lynglas'] stipulated food cost periodically throughout the contract period." Further, the contract provided that A&T had the right to delete sites on twenty-four hour notice to Lynglas. *Id.* at 7. If Lynglas failed "to comply with any of the requirements in this contract or schedule," A&T had the right to cancel the contract after giving Lynglas written notice of "specific instances of non-compliance." *Id.* at 9. These additional provisions were either part of the standard contract developed by the DPI pursuant to 7 C.F.R. Sec. 225.5(d) (1978) or added by A&T and approved by the DPI under 7 C.F.R. Sec. 225.11(c) (1978).

In its brief Pet states: "The detail of the contract (i.e., the fact that the manner as well as the result of the work was under A&T's control) and the termination provisions point inescapably to an agency relationship even under State law." We disagree.

Relying on case law distinguishing between an employer-employee relationship and an employer-independent contractor relationship, Pet attempts to establish an agency relationship between A&T and Lynglas. *Askew v. Leonard Tire Co.*, 264 N.C. 168, 141 S.E. 2d 280 (1965); *Cooper v. Asheville Citizen-Times Publishing Co., Inc.*, 258 N.C. 578, 129 S.E. 2d 107 (1963); *Hayes v.*

*Bd. of Trustees of Elon College,* 224 N.C. 11, 29 S.E. 2d 137 (1944). Pet focuses on one of the factors considered in *Hayes:* Whether the person employed (d) "is not subject to discharge because he adopts one method of doing the work rather than another." 224 N.C. at 16, 29 S.E. 2d at 140. Admittedly the A&T/Lynglas contract included basic provisions on the manner of performance, for example: container size, time of preparation and delivery and the icing of the milk. However, these provisions directly related to the result. In a letter, dated 26 June 1977 to Manuel from the director of the Summer Lunch Program, Defendant's Exhibit 8A, it is clear that Lynglas' failure to comply with the container and time requirements had resulted in delays and spoiled food. The provisions were guidelines to insure uniform results — edible meals. Given the perishable nature of the commodity, the Summer Lunch Program operated, as a matter of course, under severe time constraints and health standards, which infused the contract. The degree of specificity in the contract resembles the detailed building specifications in construction contracts. We are unwilling to find that these necessary guidelines transformed Lynglas into an employee/agent of A&T.

We now alternatively analyze the evidence before us in light of the principal elements of an agency relationship, the grant of authority to the agent to act for the principal. *Branch Banking and Trust Co. v. Creasy,* 301 N.C. 44, 269 S.E. 2d 117 (1980). A detailed contract with arguably harsh termination provisions does not, in and of itself, dictate an agency relationship. The element of control is not the crucial issue here. Rather, we are concerned with evidence of Lynglas' express or implied authority to represent and act for A&T in negotiations with third parties. *Lancaster's Stock Yards, Inc. v. Williams,* 37 N.C. App. 698, 246 S.E. 2d 823, *disc. rev. denied,* 295 N.C. 738, 248 S.E. 2d 863 (1978).

There is no evidence before us to support a grant of express or implied authority. In the A&T/Lynglas contract, Lynglas, as a "contractor," simply agreed to supply A&T with complete meals including milk. The contract provided: "The Vendor [Lynglas] is responsible for the performance of any subcontractor with whom he may arrange for the fulfillment of this contract." Defendant's Exhibit 4 at 6. Although Lynglas had the leeway to purchase milk from a "commodity distributor," it had no express or implied authority to act as A&T's agent in that purchase.

IV

[3]   Alternatively, Pet asserts that the language in an agreement between Pet and Manuel, a Lynglas officer, to provide Manuel with two refrigerated milk trucks, Plaintiff's Exhibit 8, establishes Manuel's apparent authority to act as A&T's agent. Apparent authority "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses. . . ." *Zimmerman v. Hogg & Allen*, 286 N.C..24, 31, 209 S.E. 2d 795, 799 (1974).

Plaintiff's Exhibit 8 reads, in pertinent part, as follows:

Whereas, the Party of the First Part has already agreed to supply milk to the Party of the Second Part *as its agent* pursuant to the North Carolina A&T State University and the Summer Lunch Program. . . .

Whereas, the Party of the Second Part has already agreed, as *agent of the sponsor* of said program to pay for the delivery of said milk. [Emphasis added.]

Pet is attempting to prove Lynglas' apparent authority solely through Manuel's out-of-court declarations. As a general rule, evidence of an alleged agent's out-of-court declarations is inadmissible to establish the agency relationship,

unless (1) the fact of agency appears from other evidence, and also unless it be made to appear by other evidence that the making of such statement or declaration was (2) within the authority of the agent or, (3) as to persons dealing with the agent, within the apparent authority of the agent.

*Hanover Co. v. Twisdale*, 42 N.C. App. 472, 476, 256 S.E. 2d 840, 843 (1979) (quoting *Commercial Solvents, Inc. v. Johnson*, 235 N.C. 237, 241, 69 S.E. 2d 716, 719 (1952)). Pet has provided no other evidence to establish "the fact of agency." We, therefore, cannot permit Pet to establish the agency relationship based on the alleged agent's statements.

V

In summary, the trial court did not err in granting summary judgment in favor of UNC. None of Pet's theories discussed above create a genuine issue of fact.

Affirmed.

Judges HILL and BRASWELL concur.